

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN

|  |  |  |
|---|---|---|
| [SUPPRESSED], | ) | 10CV959<br>JUDGE HOLDERMAN<br>MAG. JUDGE MASON |
| Plaintiff, | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| [SUPPRESSED], | ) | **FILED UNDER SEAL**<br>**DO NOT PLACE ON PACER**<br>**DO NOT PLACE IN PRESS BOX** |
| Defendant. | ) | |

## COMPLAINT

**FILED IN CAMERA AND UNDER SEAL**

**Pursuant to 31 U.S.C. § 3730(b)(2)**

FILED

FEB 1 1 2010
2-11-2010
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* Scott H. Plantz, M.D.,<br><br>Relator,<br><br>v.<br><br>HEALTH MANAGEMENT ASSOCIATES INC.,<br>Amory HMA, LLC; Anniston HMA, LLC; Bartow<br>HMA, LLC; Biloxi H.M.A., LLC; Brandon HMA,<br>LLC; Carlisle HMA, Inc.; Chester HMA, LLC; Citrus<br>HMA, LLC; Clarksdale HMA, LLC; Durant H.M.A.,<br>LLC; Haines City HMA, LLC; Hamlet H.M.A., LLC;<br>Hartsville HMA, LLC; Hernando HMA, LLC; HMA<br>Fentress County General Hospital, Inc.; Jackson HMA<br>LLC; Kennett HMA, Inc.; Key West HMA, LLC;<br>Lancaster HMA, Inc.; Lebanon HMA, Inc.; Lehigh<br>HMA, LLC; Lone Star HMA, L.P.; Madison HMA,<br>LLC; Marathon H.M.A., LLC; Meridian HMA, LLC;<br>Midwest Regional Medical Center, LLC; Monroe HMA<br>LLC; Mooresville Hospital Management Associates,<br>LLC; Naples HMA, LLC; Natchez Community<br>Hospital LLC; OsceolaSC, LLC; Paintsville Hospital<br>Company LLC; Pasco Regional Medical Center, LLC;<br>Poplar Bluff Regional Medical Center, Inc.;<br>Port Charlotte HMA, LLC; Punta Gorda HMA, LLC;<br>River Oaks Hospital, LLC; Riverview Regional<br>Medical Center, LLC; Rose City HMA, Inc.;<br>Santa Rosa HMA Physicians Management LLC;<br>Sebastian Hospital, LLC; Sebring Hospital<br>Management Associates, LLC; Statesboro HMA, Inc.;<br>Statesville HMA, LLC; Tullahoma HMA, Inc.;<br>Van Buren H.M.A., Inc.; Venice HMA, LLC;<br>Williamson Memorial Hospital, LLC; Winder HMA,<br>LLC; Yakima HMA, LLC;<br>COMMUNITY HEALTH SYSTEMS INC.,<br>Affinity Hospital LLC; Anna Hospital Corp.; ARMC<br>LP; Augusta Hospital LLC; Berwick Hospital Company<br>LLC; Big Bend Hospital Corp.; Big Spring Hospital<br>Corp.; Bluffton Health System LLC; Brownsville | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Case No.<br><br>Jury Trial Demanded<br><br>**FILED UNDER SEAL**<br>**DO NOT PLACE ON PACER**<br>**DO NOT PLACE IN PRESS BOX** |

Hospital Corp.; Brownwood Hospital LP; Bullhead City )
Hospital Corp.; Carlsbad Medical Center LLC; )
Cedar Park Health System LP; Centre Hospital Corp.; )
Chesterfield/Marlboro LP; CHHS Hospital Company )
LLC; Claremore Regional Hospital LLC; Clarksville )
Health System GP; Cleveland Regional Medical Center )
LP; Cleveland Tennessee Hospital Company LLC; )
Clinton Hospital Corp.; Coatesville Clinic Company )
LLC; College Station Medical Center LLC; Crestview )
Hospital Corp.; Crestwood Healthcare LP; Deaconess )
Health System LLC; Deming Hospital Corp.; DHSC )
LLC; Dukes Health System LLC; Dupont Hospital )
LLC; Dyersburg Hospital Corp.; Emporia Hospital )
Corp.; Evanston Hospital Corp.; Fallbrook Hospital )
Corp.; Fannin Regional Hospital Corp.; Foley Hospital )
Corp.; Forrest City Arkansas Hospital Company LLC; )
Fort Payne Hospital Corp.; Franklin Hospital Corp.; )
Gadsden Regional Medical Center LLC; Galesburg )
Hospital Corp.; Granbury Hospital Corp.; Granite City )
Illinois Hospital Company LLC; Greenbrier VMC LLC; )
Greenville Hospital Corp.; Hospital of Barstow Inc.; )
Hospital of Fulton Inc.; Hospital of Louisa Inc.; )
Hospital of Morristown Inc.; IOM Health System LP; )
Jackson Hospital Corp.; Jackson, Tennessee Hospital )
Company LLC; Jourdanton Hospital Corp.; Kay County )
Oklahoma Hospital Company LLC; Kirksville Missouri )
Hospital Company LLC; Lake Wales Hospital Corp.; )
Lancaster Hospital Corp.; Laredo Texas Hospital )
Company LP; Las Cruces Medical Center LLC; )
Lea Regional Hospital LLC; Lexington Hospital Corp.; )
Longview Medical Center LP; Lutheran Health )
Network of Indiana LLC; Marion Hospital Corp.; )
Martin Hospital Corp.; Mary Black Health System )
LLC; Mat-Su Valley Medical Center LLC; McKenzie )
Tennessee Hospital Company LLC; McKenzie- )
Willamette Regional Medical Center Associates; )
McNairy Hospital Corp.; MCSA LLC; MMC of )
Nevada LLC; Moberly Hospital Company LLC; )
National Healthcare of Leesville Inc.; National )
Healthcare of Mount Vernon Inc.; National Healthcare )
of Newport Inc.; Navarro Hospital LP; NHCI of )
Hillsboro Inc.; Northampton Hospital Company LLC; )
Northwest Arkansas Hospitals LLC; Oak Hill Hospital )
Corp.; Oro Valley Hospital LLC; Payson Hospital )
Corp.; Petersburg Hospital Company Inc.; Phillips )

Hospital Corp.; Phoenixville Hospital Company LLC;    )
Piney Woods Healthcare System LP; Porter Hospital     )
LLC; Pottstown Hospital Company LLC; QHG of           )
Enterprise Inc.; QHG of South Carolina Inc.; Red Bud  )
Illinois Hospital Company LLC; Roswell Hospital       )
Corp.; Ruston Louisiana Hospital Company LLC;         )
Salem Hospital Corp.; San Angelo Hospital LP;         )
San Miguel Hospital Corp.; Shelbyville Hospital Corp.; )
Siloam Springs Arkansas Hospital Company Inc.;        )
SouthCrest LLC; Spokane Valley Washington Hospital    )
Company LLC; Spokane Washington Hospital              )
Company LLC; St. Joseph Health System LLC;            )
Sunbury Hospital Company LLC; Tooele Hospital         )
Corp.; Triad of Alabama LLC; Vicksburg Healthcare     )
LLC; Victoria of Texas LP; Warsaw Health System       )
LLC; Watsonville Hospital Corp.; Waukegan Illinois    )
Hospital Company LLC; Weatherford Texas Hospital      )
Company LLC; Wesley Health System LLC;                )
West Grove Hospital Company LLC; Williamston          )
Hospital Corp.; Women and Children's Hospital LLC;    )
Woodward Health System LLC; and                       )
PROMED CLINICAL SYSTEMS LLC,                          )
                                                      )
      Defendants.      )

## FALSE CLAIMS ACT COMPLAINT

### INTRODUCTION

  1.  This case involves massive, intentional over billing of the Medicare and Medicaid health insurance programs by Community Health Systems Inc. and Health Management Associates Inc., and their subsidiaries, assisted by ProMed Clinical Systems LLC.

  2.  This action arises under 31 U.S.C. §§ 3729 *et seq.* ("the False Claims Act"). This Court has jurisdiction over this case pursuant to 31 U.SC. §§ 3730(b) and 3732(a). This Court also has jurisdiction over this case pursuant to 31 U.S.C. §§ 1331 and

1345. This case is not based on a public disclosure. The operative allegations are based on the Relator's direct knowledge.

3.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because at least one of the Defendants transacts business in this District and because some of the acts and omissions of which Plaintiff-Relator complains occurred in this District.

4.     As required by 31 U.S.C. § 3730(b)(2), Relator has provided to the Attorney General and the United States Attorney for the Northern District of Illinois, a statement of material evidence and information that Relator possess regarding this complaint. The Relator has also provided to the Attorneys General for each of the Qui Tam States, as defined, *infra,* a statement of material evidence and information that Relator possess regarding this complaint. Because the statement includes attorney-client communications and work product of Relator's counsel, and was submitted to the Attorneys General and the United States Attorney, in their capacity as potential co-counsel in this litigation, the Relator understands this statement to be confidential.

## JURY DEMAND

5.     Relator demands a jury trial on each and every claim to which he is so entitled.

## PARTIES

### Plaintiffs

6.     The Relator, Scott Plantz M.D., FAAEM ("Dr. Plantz" or "Relator"), is a physician with an extensive background in the field of emergency medicine. Dr. Plantz is a respected, highly trained and credentialed physician who is also a successful businessman. Dr. Plantz is one of approximately fifty professors of emergency medicine in the

United States. Dr. Plantz regularly provides consultation services to hospital administrators and hospital ED directors to assist them in improving ED quality of care, patient satisfaction, and throughput time. Over the last 10 years, he has given approximately 500 lectures and full-day seminars on improving quality of care in hospitals throughout the United States.

7. From May of 2009 to the present, Dr. Plantz worked over 500 hours in the Longview Regional Emergency Department. Longview Regional is a CHS hospital. As a technical matter, Dr. Plantz is an independent contractor for Longview Regional Emergency Physicians, which is a group of ED physicians who provide ED coverage to Longview Regional. For several months Dr. Plantz worked full-time at Longview Regional (120 plus hours per month) and currently works part-time (50-60 hours per month).

8. The United States of America ("United States") provides reimbursement to the Hospital Defendants for claims and requests for payment under Medicare, Champus and Tricare. The United States also pays for a significant portion of claims and requests for payments that are made to the Medicaid programs of the Qui Tam States as defined, *infra*.

9. California is a State that provides or arranges for the provision of healthcare services to certain citizens through California's Medicaid program. California receives reimbursement from the United States for some but not all of the costs of providing or arranging for the provision of care to such citizens who are eligible for Medicaid.

10. Florida is a State that provides or arranges for the provision of healthcare services to certain citizens through Florida's Medicaid program. Florida receives reimbursement from the United States for some but not all of the costs of providing or arranging for the provision of care to such citizens who are eligible for Medicaid.

11. Georgia is a State that provides or arranges for the provision of healthcare services to certain citizens through Georgia's Medicaid program. Georgia receives reimbursement from the United States for some but not all of the costs of providing or arranging for the provision of care to such citizens who are eligible for Medicaid.

12. Illinois is a State that provides or arranges for the provision of healthcare services to certain citizens through Illinois's Medicaid program. Illinois receives reimbursement from the United States for some but not all of the costs of providing or arranging for the provision of care to such citizens who are eligible for Medicaid.

13. Indiana is a State that provides or arranges for the provision of healthcare services to certain citizens through Indiana's Medicaid program. Indiana receives reimbursement from the United States for some but not all of the costs of providing or arranging for the provision of care to such citizens who are eligible for Medicaid.

14. Nevada is a State that provides or arranges for the provision of healthcare services to certain citizens through Nevada's Medicaid program. Nevada receives reimbursement from the United States for some but not all of the costs of providing or arranging for the provision of care to such citizens who are eligible for Medicaid.

15. New Jersey is a State that provides or arranges for the provision of healthcare services to certain citizens through New Jersey's Medicaid program. New Jersey receives reimbursement from the United States for some but not all of the costs of providing or arranging for the provision of care to such citizens who are eligible for Medicaid.

16. New Mexico is a State that provides or arranges for the provision of healthcare services to certain citizens through New Mexico's Medicaid program. New Mexico receives reimbursement from the United States for some but not all of the costs

of providing or arranging for the provision of care to such citizens who are eligible for Medicaid.

17.     Oklahoma is a State that provides or arranges for the provision of healthcare services to certain citizens through Oklahoma's Medicaid program. Oklahoma receives reimbursement from the United States for some but not all of the costs of providing or arranging for the provision of care to such citizens who are eligible for Medicaid.

18.     Tennessee is a State that provides or arranges for the provision of healthcare services to certain citizens through Tennessee's Medicaid program. Tennessee receives reimbursement from the United States for some but not all of the costs of providing or arranging for the provision of care to such citizens who are eligible for Medicaid

19.     Virginia is a State that provides or arranges for the provision of healthcare services to certain citizens through Virginia's Medicaid program. Virginia receives reimbursement from the United States for some but not all of the costs of providing or arranging for the provision of care to such citizens who are eligible for Medicaid.

20.     Texas is a State that provides or arranges for the provision of healthcare services to certain citizens through Texas's Medicaid program. Texas receives reimbursement from the United States for some but not all of the costs of providing or arranging for the provision of care to such citizens who are eligible for Medicaid (California, Florida, Georgia, Illinois, Indiana, Nevada, New Jersey, New Mexico, Oklahoma, Tennessee, Texas and Virginia shall be referred to as the "Qui Tam States".)

## Defendants

21.     Defendant Community Health Systems Inc. is a Delaware corporation with headquarters in Nashville, Tennessee (Community Health Systems and all of its subsidiaries named herein as defendants are referred to as "CHS").

22.     Defendant Health Management Associates Inc. is a Delaware corporation with headquarters in Naples, Florida (Health Management Associates and all of its subsidiaries named herein as defendants are referred to as "HMA"; CHS and HMA and all of their subsidiaries who are Defendants herein, are referred to as the "Hospital Defendants").

23.     ProMed Clinical Systems LLC, a computer software company is a Florida limited liability company with a principal place of business in Coral Springs, Florida (collectively ProMed Clinical Systems LLC, CHS and HMA are referred to as the "Defendants").

## HMA Defendants

24.     Amory HMA, LLC, is a corporation organized under the laws of Mississippi and provides medical services through, *inter alia,* Gilmore Memorial Regional Center.

25.     Anniston HMA, LLC, is a corporation organized under the laws of Alabama provides medical services through, *inter alia*, Stringfellow Memorial Hospital.

26.     Bartow HMA, LLC, is a corporation organized under the laws of Florida and provides medical services through, *inter alia*, Bartow Regional Medical Center.

27. Biloxi H.M.A., LLC, is a corporation organized under the laws of Mississippi and provides medical services through, *inter alia*, Biloxi regional Medical Center.

28. Brandon HMA, LLC, is a corporation organized under the laws of Mississippi and provides medical services through, *inter alia*, Crossgates River Oaks Hospital.

29. Carlisle HMA, Inc., is a corporation organized under the laws of Pennsylvania and provides medical services through, *inter alia*, Carlisle Regional Medical Center.

30. Chester HMA, LLC, is a corporation organized under the laws of South Carolina and provides medical services through, *inter alia*, Chester Regional Medical Center.

31. Citrus HMA, LLC, is a corporation organized under the laws of Florida and provides medical services through, *inter alia*, Seven Rivers Regional Medical Center.

32. Clarksdale HMA, LLC, is a corporation organized under the laws of Mississippi and provides medical services through, *inter alia*, Northwest Regional Medical Hospital.

33. Durant H.M.A., LLC, is a corporation organized under the laws of Oklahoma and provides medical services through, *inter alia*, Medical Center of Southeastern Oklahoma.

34. Haines City HMA, LLC, is a corporation organized under the laws of Florida and provides medical services through, *inter alia*, Heart of Florida Regional Medical Center.

35.     Hamlet H.M.A., LLC, is a corporation organized under the laws of North Carolina and provides medical services through, *inter alia*, Sandhills Regional Medical Center.

36.     Hartsville HMA, LLC, is a corporation organized under the laws of South Carolina and provides medical services through, *inter alia*, Carolinas Pines Regional Medical Center.

37.     Hernando HMA, LLC, is a corporation organized under the laws of Florida and provides medical services through, *inter alia*. Brooksville Regional Hospital and Spring Hill Regional Hospital.

38.     HMA Fentress County General Hospital, Inc., is a corporation organized under the laws of Tennessee and provides medical services through, *inter alia*, Jamestown Regional Medical Center.

39.     Jackson HMA LLC, is a corporation organized under the laws of Mississippi and provides medical services through, *inter alia*, Central Mississippi Medical Center.

40.     Kennett HMA, Inc., is a corporation organized under the laws of Missouri and provides medical services through, *inter alia*, Twin Rivers Regional Medical Center.

41.     Key West HMA, LLC, is a corporation organized under the laws of Florida and provides medical services through, *inter alia*, Lower Keys Medical Center.

42.     Lancaster HMA, Inc., is a corporation organized under the laws of Pennsylvania and provides medical services through, *inter alia*, Heart of Lancaster Regional Medical Center.

43.     Lebanon HMA, Inc., is a corporation organized under the laws of Tennessee and provides medical services through, *inter alia*, University Medical Center.

44.     Lehigh HMA, LLC, is a corporation organized under the laws of Florida and provides medical services through, *inter alia*, Lehigh Regional Medical Center.

45.     Lone Star HMA, L.P., is a corporation organized under the laws of Delaware and provides medical services through, *inter alia*, Dallas Regional Medical Center.

46.     Madison HMA, LLC, is a corporation organized under the laws of Mississippi and provides medical services through, *inter alia*, Madison Regional Medical Center.

47.     Marathon H.M.A., LLC, is a corporation organized under the laws of Florida and provides medical services through, *inter alia*, Fisherman's Hospital.

48.     Meridian HMA, LLC, is a corporation organized under the laws of Mississippi and provides medical services through, *inter alia*, Riley Hospital.

49.     Midwest Regional Medical Center, LLC, is a corporation organized under the laws of Oklahoma and provides medical services through, *inter alia*, Midwest Regional Medical Center.

50.     Monroe HMA LLC, is a corporation organized under the laws of Georgia and provides medical services through, *inter alia*, Walton Regional Medical Center.

51.     Mooresville Hospital Management Associates, LLC, is a corporation organized under the laws of North Carolina and provides medical services through, *inter alia*, Lake Norman regional Medical Center.

52.     Naples HMA, LLC, is a corporation organized under the laws of Florida and provides medical services through, *inter alia*, Physicians Regional Healthcare System.

53.     Natchez Community Hospital LLC, is a corporation organized under the laws of Mississippi and provides medical services through, *inter alia*, Family Medical Center.

54.     OsceolaSC, LLC, is a corporation organized under the laws of Delaware and provides medical services through, *inter alia*, St. Cloud Regional Medical Center.

55.     Paintsville Hospital Company LLC, is a corporation organized under the laws of Kentucky and provides medical services through, *inter alia*, Paul B. Hall Regional Medical Center.

56.     Pasco Regional Medical Center, LLC, is a corporation organized under the laws of Florida and provides medical services through, *inter alia*, Pasco regional Medical Center.

57.     Poplar Bluff Regional Medical Center, Inc., is a corporation organized under the laws of Missouri and provides medical services through, *inter alia*, Poplar Bluff Regional Medical Center-North and Poplar Bluff Regional Medical Center-South.

58.     Port Charlotte HMA, LLC, is a corporation organized under the laws of Florida and provides medical services through, *inter alia*, Peace River Regional Medical Center.

59.     Punta Gorda HMA, LLC, is a corporation organized under the laws of Florida and provides medical services through, *inter alia*, Charlotte regional Medical Center.

60.     River Oaks Hospital, LLC, is a corporation organized under the laws of Mississippi and provides medical services through, *inter alia*, River Oak s Hospital.

61.     Riverview Regional Medical Center, LLC, is a corporation organized under the laws of Delaware and provides medical services through, *inter alia*, Riverview Regional Medical Center.

62.     Rose City HMA, Inc., is a corporation organized under the laws of Pennsylvania and provides medical services through, *inter alia*, Lancaster Regional Medical Center.

63.     Santa Rosa HMA Physicians Management LLC, is a corporation organized under the laws of Florida and provides medical services through, *inter alia*, Santa Rosa Medical Center.

64.     Sebastian Hospital, LLC, is a corporation organized under the laws of Florida and provides medical services through, *inter alia*, Sebastian River Medical Center.

65.     Sebring Hospital Management Associates, LLC, is a corporation organized under the laws of Florida and provides medical services through, *inter alia*, Highlands Regional Medical Group.

66.     Statesboro HMA, Inc., is a corporation organized under the laws of Georgia and provides medical services through, *inter alia*, East Georgia Regional Medical Center.

67.     Statesville HMA, LLC, is a corporation organized under the laws of North Carolina and provides medical services through, *inter alia*, Davis Regional Medical Center.

68.     Tullahoma HMA, Inc., is a corporation organized under the laws of Tennessee and provides medical services through, *inter alia*, Harton Regional Medical Center.

69.     Van Buren H.M.A., Inc., is a corporation organized under the laws of Arkansas and provides medical services through, *inter alia*, Summit Medical Center.

70.     Venice HMA, LLC, is a corporation organized under the laws of Florida and provides medical services through, *inter alia*, Venice Regional Medical Center.

71.     Williamson Memorial Hospital, LLC, is a corporation organized under the laws of West Virginia and provides medical services through, *inter alia*, Williamson Memorial Hospital.

72.     Winder HMA, LLC, is a corporation organized under the laws of Georgia and provides medical services through, *inter alia*, Barrow Regional Medical Center.

73.     Yakima HMA, LLC, is a corporation organized under the laws of Washington and provides medical services through, *inter alia*, Yakima Regional Medical Center and Toppenish Community Hospital.

## CHS Defendants

74.     Affinity Hospital LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Trinity Medical Center.

75.     Anna Hospital Corp. is a corporation organized under the laws of the state of Illinois and provides medical services through, *inter alia*, Union County Hospital

76.     ARMC LP is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Abilene Regional Medical Center.

77.     Augusta Hospital LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Trinity Hospital of Augusta.

78.     Berwick Hospital Company LLC is a corporation organized under the laws of the Commonwealth of Pennsylvania and provides medical services through, *inter alia*, Berwick Hospital Center.

79.     Big Bend Hospital Corp. is a corporation organized under the laws of the state of Texas and provides medical services through, *inter alia*, Big Bend Regional Medical Center.

80.     Big Spring Hospital Corp. is a corporation organized under the laws of the state of Texas and provides medical services through, *inter alia*, Scenic Mountain Medical Center.

81.     Bluffton Health System LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Bluffton Regional Medical Center.

82.     Brownsville Hospital Corp. is a corporation organized under the laws of the state of Tennessee and provides medical services through, *inter alia*, Haywood Park Community Hospital.

83.     Brownwood Hospital LP is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Brownwood Regional Medical Center.

84.     Bullhead City Hospital Corp. is a corporation organized under the laws of the state of Arizona and provides medical services through, *inter alia*, Western Arizona Medical Center.

85.     Carlsbad Medical Center LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Carlsbad Medical Center.

86.     Cedar Park Health System LP is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Cedar Park Regional Medical Center.

87.     Centre Hospital Corp. is a corporation organized under the laws of the state of Alabama and provides medical services through, *inter alia*, Cherokee Medical Center.

88.     Chesterfield/Marlboro LP is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Chesterfield General Hospital and Marlboro Park Hospital.

89.     CHHS Hospital Company LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Chestnut Hill Health System.

90.     Claremore Regional Hospital LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Claremore Regional Hospital.

91. Clarksville Health System GP is a corporation organized under the laws of the state of Tennessee and provides medical services through, *inter alia*, Gateway Medical Center.

92. Cleveland Regional Medical Center LP is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Cleveland Regional Medical Center.

93. Cleveland Tennessee Hospital Company LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Sky Ridge Medical Center.

94. Clinton Hospital Corp. is a corporation organized under the laws of the Commonwealth of Pennsylvania and provides medical services through, *inter alia*, Lock Haven Hospital.

95. Coatesville Clinic Company LLC is a corporation organized under the laws of the Commonwealth of Pennsylvania and provides medical services through, *inter alia*, Brandywine Hospital.

96. College Station Medical Center LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, College Station Medical Center.

97. Crestview Hospital Corp. is a corporation organized under the laws of the state of Florida and provides medical services through, *inter alia*, North Okaloosa Medical Center.

98.     Crestwood Healthcare LP is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Crestwood Medical Center.

99.     Deaconess Health System LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Deaconess Hospital.

100.    Deming Hospital Corp. is a corporation organized under the laws of the state of New Mexico and provides medical services through, *inter alia*, Mimbres Memorial Hospital.

101.    DHSC LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Affinity Medical Center.

102.    Dukes Health System LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Dukes Memorial Hospital.

103.    Dupont Hospital LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Dupont Hospital.

104.    Dyersburg Hospital Corp. is a corporation organized under the laws of the state of Tennessee and provides medical services through, *inter alia*, Dyersburg Regional Medical Center.

105.    Emporia Hospital Corp. is a corporation organized under the laws of the Commonwealth of Virginia and provides medical services through, *inter alia*, Southern Virginia Regional Medical Center.

106. Evanston Hospital Corp. is a corporation organized under the laws of the state of Wyoming and provides medical services through, *inter alia*, Evanston Regional Hospital.

107. Fallbrook Hospital Corp. is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Fallbrook Hospital.

108. Fannin Regional Hospital Corp. is a corporation organized under the laws of the state of Georgia and provides medical services through, *inter alia*, Fannin Regional Hospital.

109. Foley Hospital Corp. is a corporation organized under the laws of the state of Alabama and provides medical services through, *inter alia*, South Baldwin Regional Medical Center.

110. Forrest City Arkansas Hospital Company LLC is a corporation organized under the laws of the state of Arkansas and provides medical services through, *inter alia*, Forrest City Medical Center.

111. Fort Payne Hospital Corp. is a corporation organized under the laws of the state of Alabama and provides medical services through, *inter alia*, DeKalb Regional Medical Center.

112. Franklin Hospital Corp. is a corporation organized under the laws of the Commonwealth of Virginia and provides medical services through, *inter alia*, Southampton Memorial Hospital.

113. Gadsden Regional Medical Center LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Gadsden Regional Medical Center.

114.  Galesburg Hospital Corp. is a corporation organized under the laws of the state of Illinois and provides medical services through, *inter alia*, Galesburg Cottage Hospital.

115.  Granbury Hospital Corp. is a corporation organized under the laws of the state of Texas and provides medical services through, *inter alia*, Lake Granbury Medical Center.

116.  Granite City Illinois Hospital Company LLC is a corporation organized under the laws of the state of Illinois and provides medical services through, *inter alia*, Gateway Regional Medical Center.

117.  Greenbrier VMC LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Greenbrier Valley Medical Center.

118.  Greenville Hospital Corp. is a corporation organized under the laws of the state of Alabama and provides medical services through, *inter alia*, L.V. Stabler Memorial Hospital.

119.  Hospital of Barstow Inc. is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Barstow Community Hospital.

120.  Hospital of Fulton Inc. is a corporation organized under the laws of the Commonwealth of Kentucky and provides medical services through, *inter alia*, Parkway Regional Hospital.

121.    Hospital of Louisa Inc. is a corporation organized under the laws of the Commonwealth of Kentucky and provides medical services through, *inter alia*, Three Rivers Medical Center.

122.    Hospital of Morristown Inc. is a corporation organized under the laws of the state of Tennessee and provides medical services through, *inter alia*, Lakeway Regional Hospital.

123.    IOM Health System LP is a corporation organized under the laws of the state of Indiana and provides medical services through, *inter alia*, Lutheran Hospital.

124.    Jackson Hospital Corp. is a corporation organized under the laws of the state of Tennessee and provides medical services through, *inter alia*, Kentucky River Medical Center.

125.    Jackson, Tennessee Hospital Company LLC is a corporation organized under the laws of the state of Tennessee and provides medical services through, *inter alia*, Regional Hospital of Jackson.

126.    Jourdanton Hospital Corp. is a corporation organized under the laws of the state of Texas and provides medical services through, *inter alia*, South Texas Regional Medical Center.

127.    Kay County Oklahoma Hospital Company LLC is a corporation organized under the laws of the state of Oklahoma and provides medical services through, *inter alia*, Ponca City Medical Center.

128.    Kirksville Missouri Hospital Company LLC is a corporation organized under the laws of the state of Missouri and provides medical services through, *inter alia*, Northeast Regional Medical Center.

129. Lake Wales Hospital Corp. is a corporation organized under the laws of the state of Florida and provides medical services through, *inter alia*, Lake Wales Medical Center.

130. Lancaster Hospital Corp. is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Springs Memorial Hospital.

131. Laredo Texas Hospital Company LP is a corporation organized under the laws of the state of Texas and provides medical services through, *inter alia*, Laredo Medical Center.

132. Las Cruces Medical Center LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Mountain View Regional Medical Center.

133. Lea Regional Hospital LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Lea Regional Medical Center.

134. Lexington Hospital Corp. is a corporation organized under the laws of the state of Tennessee and provides medical services through, *inter alia*, Henderson County Community Hospital.

135. Longview Medical Center LP is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Longview Regional Medical Center.

136. Lutheran Health Network of Indiana LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, the

Orthopedic Hospital of Lutheran Health Network and the Rehabilitation Center of Fort Wayne.

137.    Marion Hospital Corp. is a corporation organized under the laws of the state of Illinois and provides medical services through, *inter alia*, Heartland Regional Medical Center.

138.    Martin Hospital Corp. is a corporation organized under the laws of the state of Tennessee and provides medical services through, *inter alia*, Volunteer Community Hospital.

139.    Mary Black Health System LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Mary Black Health System.

140.    Mat-Su Valley Medical Center LLC is a corporation organized under the laws of the state of Alaska and provides medical services through, *inter alia*, Mat-Su Regional Medical Center.

141.    McKenzie Tennessee Hospital Company LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, McKenzie Regional Hospital.

142.    McKenzie-Willamette Regional Medical Center Associates is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, McKenzie-Willamette Regional Medical Center.

143.    McNairy Hospital Corp. is a corporation organized under the laws of the state of Tennessee and provides medical services through, *inter alia*, McNairy Regional Hospital.

144.   MCSA LLC is a corporation organized under the laws of the state of Arkansas and provides medical services through, *inter alia*, Medical Center of South Arkansas.

145.   MMC of Nevada LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Mesa View Regional Hospital.

146.   Moberly Hospital Company LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Moberly Regional Medical Center.

147.   National Healthcare of Leesville Inc. is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Byrd Regional Hospital.

148.   National Healthcare of Mount Vernon Inc. is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Crossroads Community Hospital.

149.   National Healthcare of Newport Inc. is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Harris Hospital.

150.   Navarro Hospital LP is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Navarro Regional Hospital.

151.   NHCI of Hillsboro Inc. is a corporation organized under the laws of the state of Texas and provides medical services through, *inter alia*, Hill Regional Hospital.

152. Northampton Hospital Company LLC is a corporation organized under the laws of the Commonwealth of Pennsylvania and provides medical services through, *inter alia*, Easton Hospital.

153. Northwest Arkansas Hospitals LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Northwest Medical Center – Bentonville, Northwest Medical Center – Springdale, and Willow Creek Women's Hospital.

154. Oak Hill Hospital Corp. is a corporation organized under the laws of the state of West Virginia and provides medical services through, *inter alia*, Plateau Medical Center.

155. Oro Valley Hospital LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Northwest Medical Center and Northwest Medical Center – Oro Valley.

156. Payson Hospital Corp. is a corporation organized under the laws of the state of Arizona and provides medical services through, *inter alia*, Payson Regional Medical Center.

157. Petersburg Hospital Company Inc. is a corporation organized under the laws of the Commonwealth of Virginia and provides medical services through, *inter alia*, Southside Regional Medical Center.

158. Phillips Hospital Corp. is a corporation organized under the laws of the state of Arkansas and provides medical services through, *inter alia*, Helena Regional Medical Center.

159. Phoenixville Hospital Company LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia,* Phoenixville Hospital.

160. Piney Woods Healthcare System LP is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Woodland Heights Medical Center.

161. Porter Hospital LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Porter Portage Hospital Campus and Porter Valparaiso Hospital Campus.

162. Pottstown Hospital Company LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Pottstown Memorial Medical Center.

163. QHG of Enterprise Inc. is a corporation organized under the laws of the state of Alabama and provides medical services through, *inter alia*, Medical Center Enterprise.

164. QHG of South Carolina Inc. is a corporation organized under the laws of the state of South Carolina and provides medical services through, *inter alia*, Carolinas Hospital System.

165. Red Bud Illinois Hospital Company LLC is a corporation organized under the laws of the state of Illinois and provides medical services through, *inter alia*, Red Bud Regional Hospital.

166.    Roswell Hospital Corp. is a corporation organized under the laws of the state of New Mexico and provides medical services through, *inter alia*, Eastern New Mexico Medical Center.

167.    Ruston Louisiana Hospital Company LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Northern Louisiana Medical Center.

168.    Salem Hospital Corp. is a corporation organized under the laws of the state of New Jersey and provides medical services through, *inter alia*, Memorial Hospital of Salem County.

169.    San Angelo Hospital LP is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, San Angelo Community Medical Center.

170.    San Miguel Hospital Corp. is a corporation organized under the laws of the state of New Mexico and provides medical services through, *inter alia*, Alta Vista Regional Hospital.

171.    Shelbyville Hospital Corp. is a corporation organized under the laws of the state of Tennessee and provides medical services through, *inter alia*, Heritage Medical Center.

172.    Siloam Springs Arkansas Hospital Company Inc. is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Siloam Springs Memorial Hospital.

173.    SouthCrest LLC is a corporation organized under the laws of the state of Oklahoma and provides medical services through, *inter alia*, SouthCrest Hospital.

174.    Spokane Valley Washington Hospital Company LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Wyoming Valley Healthcare System and Valley Hospital and Medical Center.

175.    Spokane Washington Hospital Company LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia,* Deaconess Medical Center.

176.    St. Joseph Health System LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, St. Joseph Hospital.

177.    Sunbury Hospital Company LLC is a corporation organized under the laws of the Commonwealth of Pennsylvania and provides medical services through, *inter alia*, Sunbury Community Hospital.

178.    Tooele Hospital Corp. is a corporation organized under the laws of the state of Utah and provides medical services through, *inter alia*, Mountain West Medical Center.

179.    Triad of Alabama LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Flowers Hospital.

180.    Vicksburg Healthcare LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, River Region Health System.

181.    Victoria of Texas LP is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, DeTar Hospital North and DeTar Hospital Navarro.

182.     Warsaw Health System LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Kosciusko Community Hospital.

183.     Watsonville Hospital Corp. is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Watsonville Community Hospital.

184.     Waukegan Illinois Hospital Company LLC is a corporation organized under the laws of the state of Illinois and provides medical services through, *inter alia*, Vista Medical Center.

185.     Weatherford Texas Hospital Company LLC is a corporation organized under the laws of the state of Texas and provides medical services through, *inter alia*, Weatherford Regional Medical Center.

186.     Wesley Health System LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Wesley Medical Center.

187.     West Grove Hospital Company LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Jennersville Regional Hospital.

188.     Williamston Hospital Corp. is a corporation organized under the laws of the state of North Carolina and provides medical services through, *inter alia*, Martin General Hospital.

189.    Women and Children's Hospital LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Women and Children's Hospital.

190.    Woodward Health System LLC is a corporation organized under the laws of the state of Delaware and provides medical services through, *inter alia*, Woodward Regional Hospital.

## SUMMARY OF CLAIMS

191.    The Relator seeks to recover, on behalf of the United States, damages and civil penalties arising from violations of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (the "False Claims Act").

192.    The Relator seeks to recover, on behalf of the Qui Tam States damages and civil penalties arising from violations of the California False Claims Act, Cal. Gov't. Code §§ 12650, *et seq.*, the Florida False Claims Act, Fla. Stat. §§ 68.081, *et seq.*, the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168, *et seq.*, the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.*, the Indiana False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.5-1, *et seq.*, the Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. §§ 357.010, *et seq.*, the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1, *et seq.*, the New Mexico False Claims Act, N.M. Stat. §§27-14-1, *et seq.*, the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63  §§ 5053,  *et seq.*,  the  Tennessee  Medicaid  False  Claims  Act, Tenn. Code Ann.  §§ 71-5-181,  *et seq.*,  the  Texas  Medicaid  Fraud  Protection  Act, Tex. Hum. Res. Code Ann. §§ 36.001, *et seq.*, and the Virginia Fraud Against Taxpayers Act, Va. Code §§ 8.01-216.1, *et seq.* (collectively, the "State False Claims Acts").

193.    For many years, the Hospital Defendants have been engaged in a scheme whereby they coerce their physicians and nurses to perform medical tests and procedures, and admit patients into their hospitals, despite the Hospital Defendants' knowledge that a huge number of those tests and admissions are not medically necessary. Instead, they are based on benchmarks that the Hospital Defendants set based on their financial interests.

194.    Despite the Hospital Defendants' knowledge that it is improper to seek reimbursement for medical services that are not medically necessary, the Hospital Defendants sought and received hundreds of millions, if not billions, of dollars for claims that were not medically necessary. They continue to do so.

195.    One of the most effective elements of the Defendants' scheme uses computer software called ProMed to order unnecessary medical tests. In about half of the Hospital Defendants' hospitals ProMed automatically orders medical tests and procedures, many of them very expensive, based on a few preliminary and insufficient bits of information provided by patients who visit these hospitals' Emergency Departments. Some patients who visit the Hospitals Defendants' hospitals receive more than twenty tests, in many instances before ever seeing a physician. In a large percentage of these instances, the tests are neither beneficial nor appropriate. In some instances, the tests are harmful. The Defendants know these facts to be true.

196.    To the extent that the ProMed software is not automatically ordering tests, the Hospital Defendants have used threats of job termination and other coercion to persuade their Emergency Department ("ED") physicians to order at least 80% of the tests that ProMed would have recommend. Those ProMed recommendations are based solely on

the patient's "chief complaint", which the patient or a family member tells a triage nurse upon entering the Emergency Department and which can be as non-specific as "I have nausea" or "chest pain" or "a cough" or "diarrhea".

197.    When an ED physician who is not being coerced by improper financial targets, such as the Hospital Defendants impose, sees a patient in the ED he will take a history and physical of the patient and, based on that much more comprehensive collection of information, decide which tests to order.  In many instances, that information shows that no tests at all are necessary.  Yet the Hospital Defendants penalize those physicians who order less than 80% of the tests that ProMed would have recommended based solely on the patient's chief complaint of for example, "nausea."  In setting and applying their benchmarks, the Hospital Defendants complete disregard their ED physicians' medical judgment about what tests or the number of tests that are, in fact, medically necessary for any individual patient.

198.    The ProMed defendant has designed its computer system to facilitate the Hospital Defendants' misconduct and has actively worked with the Hospital Defendants to help them implement their schemes.

199.    Any physician who resists the Hospital Defendants' pressure to order more tests risks being fired.  Dozens of doctors who work in, or supervise, the Hospital Defendants' EDs have complained to Dr. Plantz that the pressure imposed on them to meet the Hospital Defendants' benchmarks causes them to order medically unnecessary tests and admissions.

200.    The Hospital Defendants have also imposed a requirement that at least 67% of all patients who visit the ED get at least some type of test.  There is no basis in the

medical literature, patient care or medically necessity to believe that 67% of all patients who visit the ED need any tests at all.

201.    Regardless of which system results in the over-ordering of tests, the fact that these tests are ordered requires a physician to analyze the results of those tests. This drives up unnecessarily the amount that both the hospital and the physician charge for their services.

202.    Another element of the Hospital Defendants' scheme is that they impose a variety of other benchmarks on the hospital staff that have absolutely no basis in medical necessity, patient service or academic research.  The Hospital Defendants, for example, have set benchmarks for the percentage of patients who visit the ED who must be admitted into the hospital.  The Hospital Defendants have set a higher benchmark for the percentage of patients over the age of 65 who must be admitted to the hospital.   The heightened benchmark for those patients over 65 appears to be based primarily on the likelihood that these patients are eligible for Medicare.

203.    There is no way to meet these benchmarks regarding admissions other than by admitting patients to the hospital that the ED physician otherwise would not admit.

204.    The Hospital Defendants mandate that ED physicians not use 23-hour short term observation admissions but instead prescribe a full admission to the hospital.  On average, a 23-hour admission costs around $500; an average full admission costs around $4500.

205.    The Hospital Defendants use benchmarks to coerce physicians and other ED personnel to increase the level of complexity assigned to services performed in the

ED, which directly increases the amount billed to the governments. The ProMed software was designed to facilitate this intentional over-billing.

206. The Hospital Defendants enforce their benchmarks by threatening to and, in fact, (i) terminating the contracts under which a group of ED physicians provide their services to one or more of the Hospital Defendants' hospitals or (ii) terminating employment of a physician who does not meet the benchmarks.

207. When a physician is part of a group, the threat to terminate the entire contract is particularly effective because a failure by one physician to meet a benchmark can result in all of the physicians in that group losing their ability to practice at a hospital that might be the only one in the area.

208. The Hospital Defendants coerce the administrators of each hospital to vigorously enforce the benchmarks by threatening to, and actually terminating those administrators whose staff and/or ED physicians do not meet the benchmarks.

209. The Hospital Defendants' schemes cause government health insurers to overpay millions, if not billions, of dollars to the Hospital Defendants each year for unnecessary services. They also adversely impact patient care and result in liability under the False Claims Act and State False Claims Acts.

210. The Hospital Defendants, if unchecked, will continue to submit false claims for reimbursement for improperly ordered tests, admissions, and other services, causing the already-strained Medicare and Medicaid systems to overpay the Hospital Defendants, and continue to adversely impact patient care.

I.     **The Hospital Defendants; their Emergency Departments, and their Interactions with Government Health Insurance Plans**

    A.     **The Hospital Defendants**

        211.   CHS is one of the nation's leading operators of general acute care hospitals.   CHS owns, operates or leases more than 100 hospitals in 29 states, with an aggregate of more than 18,000 licensed beds.

        212.   In approximately two thirds of its markets, CHS hospitals are the sole provider of healthcare services.

        213.   Regardless of whether CHS owns, operates or leases a specific hospital or clinic, CHS controls the operations at that hospital from both the medical and financial perspective.

        214.   HMA is an operator of acute care hospitals primarily in the southeast and southwest, focusing on non-urban areas.   HMA owns and operates more than 50 hospitals in 15 states with approximately 8,000 licensed beds.   HMA controls the medical and financial aspects of the hospitals it operates.

        215.   From 2006-2008, an average of 40% of CHS's revenue came from Medicare and Medicaid.   During that same period, an average of 41% of HMA's revenue came from Medicare and Medicaid.

    B.     **The Hospital Defendants' Emergency Departments**

        216.   Each of the Hospital Defendants' hospitals has an Emergency Department ("ED"), which is sometimes termed the Emergency Room.

        217.   The Hospital Defendants' EDs are staffed by physicians who are either (i) independent contractors who work for a staffing company or (ii) employed by an entity

that is formed to provide ED services to a specific hospital. In either case, the physicians work in the EDs subject to the direction of the Hospital Defendants.

218. An ED provides initial treatment to patients with a broad spectrum of illnesses and injuries, some of which may be life-threatening and require immediate attention, and some of which are not.

219. Upon arrival to the ED, an individual typically undergoes a very brief interview by the triage nurse to help determine the nature and severity of illness or injury. The interview results in what is commonly termed the patient's "chief complaint".

220. After initial assessment and treatment by a physician, patients who follow the ED staff's advice are either (i) admitted to the hospital; (ii) kept in the ED for a 23 hour observation period; or (iii) discharged. A small percentage either leave without treatment or against medical advice.

221. The ED staff generally includes physicians, nurses and other support staff.

222. When a patient presents in the ED, an intake or triage nurse, in approximately 2-3 minutes, takes a variety of information from the patient, including the chief complaint. The chief complaint is usually a symptom, provided by the patient or family, such as "I have …. 'chest pain', 'abdominal pain', 'leg pain', 'vomiting', 'confusion', 'drug overdose', 'depression', 'cough', 'sore throat', 'headache', 'diarrhea', or 'fever'".

223. Triage nurses do not take a detailed history or perform a physical exam. Triage nurses have, at best, very limited training in the appropriate ordering of medical tests.

C. **The Hospital Defendants' Interaction With Government Medical Insurers**

224. Hospitals are paid for their services primarily by submitting invoices to various payers, including Medicare, Medicaid, CHAMPUS and Tricare. The Hospital Defendants handle all billing, reimbursement, and collection processes relating to their hospital services.

225. The Medicare program reimburses the Hospital Defendants for the services provided by its staff based upon the rates in Medicare's Physician Fee Schedule (the "Fee Schedule"), which is updated annually. The Fee Schedule is based upon various codes found in the American Medical Association's ("AMA") Current Procedural Terminology that correspond to the level of service provided ("CPT Codes").

226. The Medicare program reimburses the Hospital Defendants for the hospitals' own services in several ways. Some of those services are billed using evaluation and management codes ("E/M"), which correlate to the CPT codes. Some of those services and many types of tests are billed on a per-service basis. Some of the hospital's services are billed based on a diagnostic related group ("DRG"), which includes generally all services that the hospital must provide related to a certain diagnosis. The great majority of hospital billing for ED services is based on E/M codes and per-service billing.

## II.     Allegations Against the Defendants

### A.     The Hospital Defendants Order Hundreds Of Thousands, If Not Millions Of Tests That Are Not Medically Necessary.

#### 1.     The Hospital Defendants Use The ProMed System To Automatically Order Tests That Are Not Medically Necessary And That In Some Instances Are Harmful.

227.     The ProMed computer system ("ProMed") has a "feature" that allows a hospital to order automatically a battery of medical tests based upon fragments of information that the hospital receives from the patient. ProMed can be structured so that, for example, every time a patient over 55 years of age presents to triage and complains of abdominal pain, ProMed will automatically order a CT scan of the abdomen with contrast, Amylase, CBC with differential, Lipase, Urinalysis, EKG, and a two-view abdominal x-ray. When the physician later performs a history and physical and determines, for example, that the patient has a long history of esophageal reflux or a hiatal hernia (i.e., heart burn), all of these tests are proved irrelevant.

228.     ProMed requires that each hospital that uses ProMed's feature that allows for the auto-ordering of tests complete a "complaint test mapping" form, which identifies specific complaints, such as abdominal pain, and a specific list of tests that will be automatically ordered when a patient identifies the associated complaint. This mapping document is over 80 pages long for each hospital. The mapping document has nearly 400 different "chief complaints" that can result in the automatic ordering of tests. Some of the chief complaints result in the patient receiving more than twenty tests before ever seeing a physician or having a physician consult in any way on the patient.

229.     For example, if a patient aged 35 or over presents to triage at the ED with a chief complaint of "atraumatic chest pain", the ProMed system can automatically order what is termed a "Cardio Panel" of tests, including Basic Metabolic Panel (looking for a rare electrolyte disorder in this age group), CBC with Diff (looking for rare anemia or infection in this age group), CPK MB, Myoglobin, Troponin (looking for a rare heart attack in this age group), D-Dimer (looking for a rare pulmonary embolism in this age group), Magnesium (looking for a rare subtherapeutic level in this age group), PT, PTT (looking for a rare bleeding disorder in this age group), VQ Scan (looking for a rare pulmonary embolism in this age group), ABG (looking for a rare pulmonary embolism in this age group), EKG (looking for a rare heart condition in this age group), and Chest x-ray (looking for a rare lung collapse, infection, or cancer in this age group).  If the physician's history and physical exam determines that the chest pain is clearly related to a non-cardiac disease (e.g., chest wall pain, pleuritis, common cold), most if not all of these tests are proved unnecessary.  It is common in the ED setting for patients to present with acute anxiety attacks that cause chest pain. Trained ED physicians will give a $10 anti-anxiety shot and see if there is an appropriate response.  All of the above tests looking for an acute heart attack, pulmonary embolism, aortic dissection, pneumothorax and other semi-rare life-threatening events are proved unnecessary.

230.     Focusing on some of the tests on the complaint test mapping form demonstrates the extent of the Hospital Defendants' ordering of medically unnecessary tests. The Cardio Panel tests screen for an acute heart attack or blood clot in the lungs.  These tests should not be used until the patient has had symptoms for several hours because it takes that long for the symptoms to screen positive.  Similarly, a magnesium test is properly ordered

only if a patient has a poor history of nutrition. A urine drug screen should never be ordered on the basis of a chief complaint, but rather only if there is reason to suggest the patient has been using non-prescription drugs. The PT/PTT tests look for blood clotting disorders and typically are only ordered if the patient is going to surgery or is taking a blood thinner such as heparin or Coumadin, and should not be ordered based solely on a complaint of chest pain. The Nuclear Medicine VQ scan is a test used to find a blood clot in the lung. It is an extremely expensive test and would only be used if the patient has a particular risk factor, and should never be ordered without a complete physical and patient history.

231. Currently there is a national shortage of the radioactive isotope used for the Nuclear Medicine VQ scan – wasting scarce resources in this manner may prevent the benefit of the test to a patient that actually has a true need for it.

232. The most fundamental principles of ED medicine require a history and physical examination before ordering a panoply of tests. There is no science or literature that would suggest any medically necessary battery of tests could be predicted based on the patient's "chief complaint." The hospital has no basis to conclude that the tests identified in the complaint test mapping form are medically necessary before a patient has even entered the ED. The "chief complaint" that a patient identifies (such as "my stomach hurts") has little correlation with the actual problem eventually discovered after a history and physical examination by a trained ED physician.

233. On average, the complaint test mapping form identifies more than six tests for each chief complaint. Prior to an ED physician conducting a physical examination and a history, the hospital would have no basis to conclude that the vast majority of these tests were medically necessary.

-41-

**B.** **Even Where The Hospital Defendants Do Not Use ProMed To Automatically Order Tests, They Apply A Baseless Benchmark To Dramatically Increase The Number Of Unnecessary Tests That The ED Physicians Order.**

234.    Approximately half of the Hospital Defendants' hospitals do not use ProMed's automatic test ordering feature.    In those instances where ProMed does not automatically order the battery of tests catalogued in the "complaint test mapping" document, the Hospital Defendants have created a benchmark that still results in significant ordering of medically unnecessary tests.    The Hospital Defendants have created a benchmark that requires that the ED physician order 80% of the tests that ProMed would have ordered based on the "chief complaint" identified by the patient during triage.    This benchmark applies even if the ED physician has determined that none of the tests on the complaint test mapping form are necessary.

235.    As noted above, the chief complaint is based on the 2-3 minute initial interaction that the triage nurse has with the patient and does not take into account the physician's physical exam of the patient or the history that the patient provides.    There is no science or literature that supports the validity of requiring that a physician order 80% of the tests that are identified prospectively based on a "chief complaint" and that completely ignores the detailed history and physical exam of a trained ED physician.    The only basis for requiring that a physician order 80% of ProMed's "recommended" tests is for the Defendant Hospitals to increase revenue.    Indeed, the only way that an ED physician can try to meet this benchmark is by ordering tests that the physician's judgment suggests is unnecessary. ProMed is specifically designed to facilitate the Hospital Defendants' over-ordering of medical tests.

236.   It is common for the ED at one of the Hospital Defendants' hospitals to be staffed by an independent ED contractor staffing company whose physician employees work in the ED subject to the Hospital Defendants' ultimate direction.

237.   ProMed's automatic ordering feature results in a slew of unnecessary medical tests at the Hospital Defendants' hospitals.  The ProMed software decreases the productivity of EDs as measured by patients per hour.  The increased revenue from the additional (albeit unnecessary) tests more than make up for the decreased throughput of patients.

238.   The practice of automatically ordering a slew of tests based on the chief complaint is very dangerous.  When so many tests are ordered it takes a long time to receive the results of the entire battery of tests.  Some patients end up leaving the ED before they even get the results (according to an internal report, attached hereto as Exhibit A, an average of 30 people per month leave the ED prematurely (i.e., "LWOT" or Leave Without Treatment).

239.   If individuals doctors did not meet the 80% benchmark, the contract for that doctor and other ED physicians is at risk.   CEO's for CHS and HMA hospitals have been fired because their hospital did not meet the benchmarks set by CHS or HMA, respectively.

240.   In short, the directors of the individual hospitals are threatened as follows:  In order to keep their jobs they need either to (i) allow ProMed to automatically order a "large and broad" array of tests on its own or (ii) order tests sufficient to meet the ProMed 80% benchmark for the number of tests that are ordered regardless of their judgment of what tests are medically necessary.

-43-

241.    The Defendants have forced numerous contracted physician groups to go along with use of the ProMed system even though the physicians have significant objections to, for example, the automatic ordering of tests or meeting scientifically-baseless benchmarks.    The Defendants have squelched these objections by threatening to fire individual physicians or cancel contracts for physician groups.

242.    In particular, when Dr. Plantz, the Relator, approached the administrator of Longview Regional Medical Center to raise concerns over ProMed, the administrator responded by threatening to terminate the contract for the entire group of physicians for which Dr. Plantz worked.  The Hospital Defendants force the ED physicians to use ProMed by threatening their ability to practice medicine.

243.    Importantly, a physician that challenges the Hospital Defendants is not simply risking his own job.  As noted above, the great bulk of the Hospital Defendants' physicians work for groups that have a single contract to provide many physicians to a variety of hospitals.  If the Hospital Defendants terminate the contract, all of those physicians would lose their ability to practice at the Hospital Defendants' hospitals.  Some of those hospitals are the only facility within the region.  The pressure to comply with the Hospital Defendants' demands is intense.

### C.    The Defendants' Unnecessary Tests Result in Improperly Increased Physician and Nursing Hospital Charges

244.    The Hospital Defendants' practice of administering unnecessary tests also results in increased physician charges and increased hospital nursing charges.  Once the Hospital Defendants order a test, a physician must review the test.  Given that physician charges are based in part of the amount of time that is required on the part of the physician,

the fact that the physician must review the tests causes increased physician charges. Some "chief complaints" result in more than twenty tests, so it can take the physician a long time to review them

245. In addition, the hospital also bills for its own evaluation and management services (E/M services) related to a patient in the ED. The amount that the Hospital Defendants are permitted to bill for an ED visit depends on the acuity of the circumstances. EDs typically maintain an "acuity scale" of 1 through 5, with "1" representing the simplest visit and "5" representing the most complex visit. When a hospital administers tests, the acuity level of the ED visit rises. A higher acuity level results in a higher charge to the government. Moreover, if the tests requires a patient's blood, for example, the fact that a nurse must draw that blood also increases the level of the visit and the concomitant charge to the government.

**D.     The Defendants Have Created Additional Benchmarks That Are Designed Solely To Increase Revenue. These Benchmarks And The Use of ProMed Result in the Hospital Defendants Billing the Government For Services That Clearly Are Not Medically Necessary.**

**1.     Benchmarks That Increase Admissions.**

246. The Hospital Defendants have created a variety of other benchmarks and mandates that their physicians, nurses and administrative staff are coerced to meet. The benchmarks, however, are arbitrary targets based on increasing the Hospital Defendants' profit. The benchmarks have little or nothing to do with patient care or proper utilization of the Hospital Defendants' services.

247. One of the most stark examples is that the Hospital Defendants have mandated that the ED physicians should not use a 23-hour observation of a patient. Instead,

in any case where the physician would have used a 23-hour observation in the ED, the physician must simply admit the patient to the hospital. On average, a 23-hour observation results in revenue of approximately $500. A full admission to the hospital results in revenue of approximately $4,500, excluding all of the additional "services" that the hospital can provide to the person who is now an in-patient. Importantly, the 23-hour observation tool is used primarily for patients who qualify for Medicare.

248. The Hospital Defendants have been very effective in eliminating the use of 23-hour observations. Nationwide, about 25% of all "admissions" are actually 23-hour observations. An internal report for April 2009 for eight of CHS' hospitals shows that none of them have a greater than 1% use of 23-hour observations. Two of the hospitals do not have any and two of the hospitals have only one 23-hour observation. The total number of 23-hour observations for all eight hospitals is 38. In contrast, the eight hospitals have 637 full hospital admissions. *See* Exhibit A.

249. One of the CEO's of CHS said that doctors were not allowed to use 23-hour observation and that all patients should be admitted. If it turned out the government denied the admission, the CEO said that CHS would blame it on the doctor and fight with Medicare for payment.

250. But the Hospital Defendants do not simply turn 23-hour observations into admissions, they also attempt to force the physicians to admit into the hospital people that the physician would otherwise have discharged completely. For example, the Defendants have set a minimum benchmark for the percentage of patients that are admitted to the hospital from the ED. The Hospital Defendants use the same percentage (16%) for every one of their hospitals. As a threshold matter, that percentage is greater than the

-46-

national average for EDs, which is 12%. Moreover, whether a patient is admitted to the hospital from the ED should be determined by whether an admission is medically necessary, not whether the hospital administrator or ED physician is trying to satisfy an arbitrary benchmark. There is no justification in the medical literature, patient care or medical necessity for setting benchmarks that encourage physicians to admit a certain percentage of patients to the hospital (of course, once a patient is admitted to the hospital, the level of charges increases dramatically). There is no way that a physician can attempt to meet these benchmarks other than by admitting patients to the hospital that they would otherwise have discharged, especially given the fact that they can't simply keep the patient in the ED for observation.

251.    One residency trained emergency physician had a low admit rate. His job was threatened and he became so scared that he now has a 28% admit rate.

252.    A hospital in Texas purchased by CHS had only a 10% admit rate at the time of purchase. The CEO of the hospital was told that she would lose her job if the admission rate was not increased.

253.    The Hospital Defendants have a different and higher benchmark for the number of patients who are older than 65 who are admitted. Of course, patients who are 65 are more likely to qualify for Medicare coverage.

254.    Normal practice across the country is for an ED physician to call the patient's general physician (i.e., the patient's "attending" physician) only if the ED physician decides that an admission is medically necessary. But the Hospital Defendants have imposed a benchmark requiring that each ED physician place calls to a minimum percentage of the attending physicians. These calls invariably result in more admissions because when an ED

doctor calls another physician, especially in the middle of the night, and says "I'm not sure here. What do you think?", the attending physician will almost always suggest an admission, if nothing else to avoid potential liability. In order to meet the benchmark, the ED physician may need to call an attending physician to discuss cases even where the ED physician does not have any reason to believe that an admission is medically necessary.

255. The call by the ED physician also increases the acuity level of the visit and also results in a charge by the ED physician for making the "consultation" call. Similarly, every time an ED physician makes an admission, the acuity level for that physician frequently becomes a "5", the highest and most profitable acuity level for the physician's charges related to that patient. This benchmark was designed solely to increase revenue.

256. The Hospital Defendants are aggressive in enforcing their benchmarks. If the CEO of an individual hospital fails to persuade his doctors to achieve an adequate admission rate, he will be fired. In fact, CEO's of CHS and HMA hospitals have been fired due to their failure to reach benchmarks such as the artificial 16% admit rate. Moreover, and as discussed above, the Hospital Defendants would also threaten to terminate the contract for an entire physician group. If a physician group's contract is terminated, then all of the doctors in their group lose their ability to practice medicine at the Hospital Defendants' hospitals.

### 2. Acuity Score Benchmark

257. The Hospital Defendants have set a benchmark for the nursing acuity weighted mean at 3.43. Given that the great bulk of the Hospital Defendants' hospitals are in rural areas or areas that have a patient mix with less morbidity than a trauma center, it is

impossible to reconcile a benchmark of 3.43 with a fair distribution of charges to the governments. Instead, these benchmarks are financially driven and have nothing to do with the actual acuity level of the visit or the provision of appropriate patient care. More importantly, no hospital could be expected to control the complexity of the situations presented in the ED. To the extent an acuity benchmark was appropriate to gauge the medical care provided by the ED, the hospital would favor lower acuity benchmarks as an indication that the ED was keeping the patient's signs and symptoms under control or was being more efficient. Yet, the goal of Defendants' acuity benchmarks is for the hospital to make the average acuity level higher, demonstrating that the acuity benchmarks are motivated solely by how much money the hospitals can generate from each patient based on a higher acuity score.

258.    The ProMed system is set up so that it forces physicians and nurses to enter more information than they otherwise would have chosen to enter. This necessarily raises the acuity level for both the physician and the hospital because the acuity level is based in part on the number of patient "systems" that the physician reviews.

259.    ProMed requires a variety of information about each patient encounter to be entered into the computer system through a variety of data entry screens. ProMed, however, makes it appear as though the provider has done more work than was actually performed. For example, if the nurse or physician documents a negative review of systems as part of the history, ProMed will automatically insert a detailed list of negative findings that were never asked and are difficult or tedious to attempt to remove. If the ED physician notes a normal heart rate, the ProMed system may also document several other "normal" physical findings that were never evaluated. It is very difficult to remove these extraneous

entries that essentially pad the chart and raise either the nurse or physician acuity levels. The time necessary to remove this incorrect information may be several extra minutes, minutes that busy nurses and emergency physicians do not have and will not take time to spend. As a result, physicians and nurses leave in extra information that raises billing acuity level and increases revenues. Further, the system constantly prompts both nurses and physicians to add additional information just to raise the acuity/billing level one level higher in order to get past a screen.

260. Simple visits are improperly increased into level 3 or 4 acuity. For example, a simple case of "influenza" that requires a 30 second flu swab on the part of the nurse and a 3 minute history and physical on the part of the physician is billed out as a level 4 nursing acuity. The hospital billed at a level 4 not because the case required significant work, but because ProMed generated extra documentation and a highly inflated numerical system that artificially raises the acuity score based on tracking tests and adding superfluous information.

261. Entering data into the ProMed system also slows down the ED dramatically. Nonetheless, the Hospital Defendants use ProMed for their hospitals because it greatly increases revenue.

**E.    The Portacci Memo**

262. Dr. Plantz has obtained a copy of a May 27, 2009 memo from Michael Portacci, the president of operations for a division of CHS, sent to a group of senior CHS executives (the "Portacci Memo"). In his memo, Portacci encourages the other senior CHS executives to admit more patients from the ED – particularly those over age 65 (who qualify for Medicare reimbursement). Portacci wrote:

> In comparing our April percentage rate of 14.5% to the company benchmark of 16.0%, we potentially lost 641 admissions for the month. Just hitting a 45% admission benchmark for patients 65-older would have yielded 251 admissions.

263.    A copy of the Portacci Memo is attached hereto as Exhibit A. Portacci made efforts to cause monthly competition between the various divisions within CHS to meet the benchmarks even though different EDs have a different mix of patients each month:

> As a further matter of comparison, Divisions II and IV have the lowest admission percentage of all Divisions for April '09 YTD.

Portacci then emphasized that it was "imperative" to use the ProMed computer system as a tool to increase admissions:

> As continually stated, it is imperative that we follow the ED quality initiatives and utilize ProMed as a tool or resource to retain more appropriate admissions. There continues to be opportunity with your daily/weekly management of the ED patients and patients in the 65-older category continue to run well below the benchmark.

264.    Portacci does not point to any factual basis to conclude that a single patient who should have been admitted to the hospital but who was not. Portacci does not point to a single patient chart or a discussion with anyone trained in medicine. His only basis for sending the May 27 memo telling a group of CHS senior executives that it was "imperative" to admit more patients from the ED (and especially those who were Medicare eligible) was that admitting more patients to the hospital allowed the hospital to make more money. While Portacci's benchmark is that 16% of all patients who visit the ED be admitted to the hospital, the national average is 12%.

265.    In his memo, Portacci effectively directs the other senior executives to persuade their physicians to admit patients who they would otherwise have not admitted.

Importantly, Portacci's memo focuses on the benchmarks for patients 65 and older because those patients are likely to qualify for Medicare reimbursement – representing guaranteed revenue to the hospital. Importantly, Portacci pits executive against executive in meeting the benchmarks. As many physicians who work for the Hospital Defendants have told Dr. Plantz, failure to meet the benchmarks is grounds for termination. When one group is able to meet the benchmarks, it adds even more reason for others to try to meet the benchmarks.

266. To the extent that one could even consider an admission or discharge benchmark, one would need to take into account the specific community setting of the hospital at issue. ED's in a community setting may regularly see less acute patients. Trauma facilities would have major difference in the range of illnesses and the necessity for admission. The Hospital Defendants use the same benchmark for every one of their 175 hospitals.

F. **The Defendants' Schemes Adversely Impact Patient Care**

267. The Defendants' schemes to deliver and bill for unnecessary services not only result in false claims to the government, but also adversely impact patient care. First and foremost, patients are subjected to tests which may be, at best, unnecessary and at worst harmful. For example, for all patients age 55 years or older complaining of abdominal pain, ProMed can automatically order a CT scan of the abdomen with contrast. This test should not be ordered, however, until a physician has enough information to weigh the benefits of the test against the risks of renal failure, and/or an allergic reaction, both of which can cause long-term health problems or even death. Other tests that ProMed automatically orders without physician consultation present similar risks. Moreover, as ProMed increases

-52-

testing, and due to the inefficient nature of its chart creation, it simultaneously slows ED throughput time. This increases waits in the waiting room and increases the risk that other patients may suffer life threatening events while waiting in triage or the waiting room.

268. The May 27 Portacci Memo contains a variety of metrics, including the time before a patient is seen. It is noteworthy that Portacci does not discuss this metric, which is one of the only metrics that has anything to do with the quality of patient care. Most hospitals are very concerned with lowering throughput time. Throughput time at those hospitals is actually double the benchmark. Portacci also fails to address the rate of patients that are left without being seen and those that leave against medical advice. Instead, he focuses solely on the arbitrary metrics that were implemented to increase revenue.

### G. The Use of ProMed Results in Significant HIPPA Violations

269. The ProMed system creates HIPPA violations on a regular basis. For example, if personal health information is inadvertently typed into the wrong patient's file, it is impossible to remove that information from that patient's file. Therefore, that patient, and potentially many others, will have access to the personal health information of another patient. ProMed Clinical Systems LLC has done nothing to address this failure despite repeated complaints from the ED Physicians and staffing companies and despite the fact that the Defendants know that on a regular basis ProMed is causing the Hospital Defendants to violate the law. The only explanation for the Hospital Defendants' willingness to use a system with these problems is that it creates so much revenue.

### III. The Allegations Against the Defendants Give Rise to Liability Under the False Claims Act and State False Claims Acts

270. The Hospital Defendants make patient care and billing decisions based not on medical necessity, but rather by the use of profit-driven benchmarks, mandates and procedures. They rely on the ProMed system, which was specifically designed to allow the Hospital Defendants to perform medically unnecessary tests and admissions. The result is that the Hospital Defendants present invoices and claims for payment to Medicare and Medicaid for services which they know are not medically necessary, and which are made through a decision-making process that is tainted by financial goals that have no place in determining the level of medical care required.

271. The Hospital Defendants provide kickbacks to the doctors who admit patients to the Hospital Defendants' hospitals. Those physicians who meet the Hospital Defendants' various benchmarks are either given more money, do not have their pay reduced (which is functionally the equivalent) and are not fired. Those physicians who do not meet the benchmarks do not receive the additional money given to those who do meet the benchmarks, have their pay reduced (compared to those physicians who do meet the benchmarks) and/or are fired.

272. The Anti-Kickback statute makes it a crime to (among other things) knowingly and willfully solicit, receive, offer, or pay remuneration in return for purchasing or ordering any item or service for which payment may be made under a federal health care program, including Medicare. 42 U.S.C. § 1320a-7b(b). Similarly, the Stark law prohibits physicians from making referrals to entities with which it has a financial relationship. 42 U.S.C. § 1395nn. The Hospital Defendants knowingly violated both the Anti-Kickback

statute and the Stark law by providing remuneration and/or other consideration in exchange for their referring patients to the hospitals for admissions.

273. The Hospital Defendants conspired with ProMed regarding the schemes described above.

## IV.     Damages

274. The damages to the governments, through Medicare, Medicaid Champus and Tricare, as a result of the Defendants' schemes have been, and will continue to be, enormous. The Defendants' scheme have resulted in the governments paying for an enormous number of tests that they knew were not medically necessary.

275. The governments have paid invoices for both nursing and physician as well as hospital services that have been increased based on the Defendants' schemes.

276. The governments have paid for a huge number of admissions, which were not medically necessary, because the Hospital Defendants mandated that the ED physicians not use a 23-hour observation, which might have been medically necessary.

277. The Hospital Defendants' benchmarks requiring a 16% admission rate have caused the governments to pay for a huge number of admissions that were not medically necessary but which were ordered solely to comply with the baseless benchmarks.

278. The other schemes identified herein have caused the governments to be damaged as well.

279. The plaintiffs are also entitled to penalties of between $5,500 and $11,000 for each false claim. Penalties are mandatory. Main v. Oakland City University, 426 F.3d 917 (7th Cir. 2005).

## COUNT I
### (Violation of the Federal False Claims Act)

280.    Dr. Plantz realleges and incorporates by reference the allegations made

in Paragraph 1 through 279 of this Complaint as though fully set forth herein.

281.    This is a claim for treble damages and civil penalties under the False

Claims Act, 31 U.S.C. §§ 3729-32,[1] as amended.

282.    Prior to May 20, 2009, 31 U.S.C. § 3729(a) provided, in relevant part,

liability for any person who –

(1)    knowingly presents, or causes to be presented, to an officer or
employee of the United States Government or a member of the
Armed Forces of the United States a false or fraudulent claim
for payment or approval;

(2)    knowingly makes, uses, or causes to be made or used, a false
record or statement to get a false or fraudulent claim paid or
approved by the Government;

(3)    conspires to defraud the Government by getting a false or
fraudulent claim allowed or paid . . .

(7)    knowingly makes, uses, or causes to be made or used, a false
record or statement to conceal, avoid, or decrease an obligation
to pay or transmit money or property to the Government . . .

283.    On May 20, 2009, 31 U.S.C. § 3729(a) was amended to provide, in

relevant part, liability for:

(1)    any person who –

(A)    knowingly presents, or causes to be presented, a false or
fraudulent claim for payment or approval;

_____

[1]  The citation of statutes herein is for convenience only and is not intended to limit the bases for
liability or recovery.

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)    conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) . . .

(G)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . .

284.    Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1) and continue to do so in violation of 31 U.S.C. § 3729(a)(1)(A), as amended on May 20, 2009.

285.    Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, and to get false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(2) and 31 U.S.C. § 3729(a)(1)(B), as amended on May 20, 2009.

286.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves, their employees and the people who worked in their emergency departments who were not employee to defraud the United States Government by knowingly presenting, or causing to be presented to officers, employees, or agents of the United States Government false or fraudulent claims for payment or approval in

Case: 1:10-cv-00959 Document #: 1 Filed: 02/11/10 Page 58 of 85 PageID #:58

violation of 31 U.S.C. § 3729(a)(3) and continue to do so in violation of 31 U.S.C. § 3729(a)(1)(C), as amended on May 20, 2009.

287. Defendants also conspired among themselves, their employees and people who worked in their emergency departments who were not employee to defraud the United States Government by knowingly making, using or causing to be made or used, false records or statements material to false or fraudulent claims, and to get false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(3) and continue to do so in violation of 31 U.S.C. § 3729(a)(1)(C), as amended on May 20, 2009.

288. Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States Government in violation of 31 U.S.C. § 3729(a)(7) and 31 U.S.C. § 3729(a)(1)(G), as amended on May 20, 2009.

289. Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

290. The United States Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

291.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**COUNT II**
**(Violation of the California False Claims Act)**

292.    Relator realleges and incorporates by reference the allegations made in Paragraph 1 through 279 of this Complaint as though fully set forth herein.

293.    This is a claim for treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code §§ 12650, *et seq.*

294.    Cal. Gov't Code § 12651(a) provides liability for any person who –

(1)     Knowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval.

(2)     Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision.

(3)     Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.

295.    Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the State of California or a political subdivision thereof, false claims for payment or approval in violation of Cal. Gov't Code § 12651(a)(1).

296.    Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false claims paid or approved by the State of California or a political subdivision thereof in violation of Cal. Gov't Code § 12651(a)(2).

297.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves, their employees and people who worked in the emergency departments who were not employees to defraud the State of California or a political subdivision thereof by getting a false claim allowed or paid by the State of California or a political subdivision thereof in violation of Cal. Gov't Code § 12651(a)(3).

298.    Defendants knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

299.    The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

300.    By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT III
### (Violation of the Florida False Claims Act)

301.    Relator realleges and incorporates by reference the allegations made in Paragraph 1 through 279 of this Complaint as though fully set forth herein.

302.    This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. §§ 68.081, *et seq.*

303.    Fla. Stat. § 68.082(2) provides liability for any person who –

      (a)    Knowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval;

      (b)    Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency;

      (c)    Conspires to submit a false or fraudulent claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid . . .

304. Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers or employees of an agency of the State of Florida false or fraudulent claims for payment or approval in violation of Fla. Stat. § 68.082(2)(a).

305. Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by an agency of the State of Florida in violation of Fla. Stat. § 68.082(2)(b).

306. Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves their employees and people who worked in the emergency departments who were not employees to submit a false or fraudulent claim to an agency of the State of Florida or to deceive an agency of the State of Florida for the purpose of getting a false or fraudulent claim allowed or paid in violation of Fla. Stat. § 68.082(2)(c).

307. Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

308.    The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

309.    By reason of Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT IV
### (Violation of the Georgia False Medicaid Claims Act)

310.    Relator realleges and incorporates by reference the allegations made in Paragraph 1 through 279 of this Complaint as though fully set forth herein.

311.    This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168, *et seq.*

312.    Ga. Code Ann. § 49-4-168.1 provides liability for any person who –

(1)    Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2)    Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

(3)    Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid . . .

313.    Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the Georgia Medicaid program false or fraudulent claims for payment or approval in violation of Ga. Code Ann. § 49-4-168.1(1).

314.    Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program in violation of Ga. Code Ann. § 49-4-168.1(2).

315.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves, their employees and people who worked in the emergency departments who were not employees to defraud the Georgia Medicaid program by getting false or fraudulent claims paid or approved by the Georgia Medicaid program in violation of Ga. Code Ann. § 49-4-168.1(3).

316.    Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

317.    The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

318.    By reason of Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

<u>**COUNT V**</u>
**(Violation of the Illinois Whistleblower Reward and Protection Act)**

319.    Relator realleges and incorporates by reference the allegations made in Paragraph 1 through 279 of this Complaint as though fully set forth herein.

320. This is a claim for treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq*.

321. Section 3 of the Illinois Whistleblower Reward and Protection Act provides liability for any person who –

(1) knowingly presents, or causes to be presented, to an officer or employee of the State or a member of the Guard a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(3) conspires to defraud the State by getting a false or fraudulent claim allowed or paid . . .

322. Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the State of Illinois false or fraudulent claims for payment or approval in violation of 740 ILCS 175/3(a)(1).

323. Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Illinois in violation of 740 ILCS 175/3(a)(2).

324. Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves, their employees and people who worked in the emergency departments who were not employees to defraud the State of Illinois by getting false or fraudulent claims paid or approved by the State of Illinois in violation of 740 ILCS 175/3(a)(3).

325. Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

326. The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

327. By reason of Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

### COUNT VI
**(Violation of the Indiana False Claims and Whistleblower Protection Act)**

328. Relator realleges and incorporates by reference the allegations made in Paragraph 1 through 279 of this Complaint as though fully set forth herein.

329. This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5, *et seq.*

330. Section 2(b) of the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5-2 provides liability for any person who knowingly or intentionally –

    (1)    presents a false claim to the state for payment or approval;

    (2)    makes or uses a false record or statement to obtain payment or approval of a false claim from the state;

    (3)    conspires with another person to perform an act described in subdivisions (1) through (6); or

    (4)    causes or induces another person to perform an act described in subdivisions (1) through (6).

331.   Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the State of Indiana false or fraudulent claims for payment or approval in violation of IC 5-11-5.5-2.

332.   Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Indiana in violation of IC 5-11-5.5-2.

333.   Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves, their employees and people who worked in the emergency departments who were not employees to defraud the State of Indiana by getting false or fraudulent claims paid or approved by the State of Indiana in violation of IC 5-11-5.5-2.

334.   Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

335.   The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

336.   By reason of Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT VII
### (Violation of the Nevada Submission of
### False Claims to State or Local Government Act)

337.    Relator realleges and incorporates by reference the allegations made in Paragraph 1 through 279 of this Complaint as though fully set forth herein.

338.    This is a claim for treble damages and civil penalties under the Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. §§ 357.010, *et seq.*

339.    Nev. Rev. Stat. § 357.040(1) provides liability to any person who –

(a)    Knowingly presents or causes to be presented a false claim for payment or approval.

(b)    Knowingly makes or uses, or causes to be made or used, a false record or statement to obtain payment or approval of a false claim.

(c)    Conspires to defraud by obtaining allowance or payment of a false claim.

340.    Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the State of Nevada false claims for payment or approval in violation of Nev. Rev. Stat. § 357.040(1)(a).

341.    Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to obtain payment or approval of a false claim in violation of Nev. Rev. Stat. § 357.040(1)(b).

342.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves, their employees and people who

worked in the emergency departments who were not employees to defraud the State of Nevada by obtaining allowance or payment of a false claim in violation of Nev. Rev. Stat. § 357.040(1)(c).

343.    Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

344.    The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

345.    By reason of Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

### COUNT VIII
**(Violation of the New Jersey False Claims Act)**

346.    Relator realleges and incorporates by reference the allegations made in Paragraph 1 through 279 of this Complaint as though fully set forth herein.

347.    This is a claim for treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1, *et seq.*

348.    N.J. Stat. Ann. § 2A:32C-3 provides liability to any person who –

a.    Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

b.    Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

        c.      Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State . . .

349.    Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to employees, officers, or agents of the State of New Jersey, or to any contractor, grantee, or other recipient of New Jersey state funds, false or fraudulent claims for payment or approval in violation of N.J. Stat. Ann. §§ 2A:32C-3(a).

350.    Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey in violation of N.J. Stat. Ann. §§ 2A:32C-3(b).

351.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves, their employees and people who worked in the emergency departments who were not employees to defraud the State of New Jersey by getting false or fraudulent claims allowed or paid by the State of New Jersey in violation of N.J. Stat. Ann. §§ 2A:32C-3(c).

352.    Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

353.    The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

354. By reason of Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT IX
### (Violation of the New Mexico False Claims Act)

355. Relator realleges and incorporates by reference the allegations made in Paragraph 1 through 279 of this Complaint as though fully set forth herein.

356. This is a claim for treble damages and civil penalties under the New Mexico False Claims Act, N.M. Stat. Ann. §§ 27-14-1, *et seq.*

357. N.M. Stat. Ann. § 27-14-1 provides liability to any person who –

    a.    presents, or causes to be presented, to the state a claim for payment under the medicaid program knowing that such claim is false or fraudulent;

    * * *

    c.    makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the medicaid program paid for or approved by the state knowing such record or statement is false;

    d.    conspires to defraud the state by getting a claim allowed or paid under the medicaid program knowing that such claim is false or fraudulent;

358. Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to employees, officers, or agents of the State of New Mexico, or to any contractor, grantee, or other recipient of New Mexico state funds, false or fraudulent claims for payment or approval in violation of N.M. Stat. Ann. §§ 27-14-4(A).

359. Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements

to get false or fraudulent claims paid or approved by the State of New Mexico in violation of N.M. Stat. Ann. §§ 27-14-4(C).

360.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves, their employees and people who worked in the emergency departments who were not employees to defraud the State of New Mexico by getting false or fraudulent claims allowed or paid by the State of New Mexico in violation of N.M. Stat. Ann. §§ 27-14-4(D).

361.    Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

362.    The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

363.    By reason of Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT X
### (Violation of the Oklahoma Medicaid False Claims Act)

364.    Relator realleges and incorporates by reference the allegations made in Paragraph 1 through 279 of this Complaint as though fully set forth herein.

365.    This is a claim for treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63 §§ 5053, *et seq.*

366.    Okla. Stat. tit. 63 § 5053.1(B) provides liability to any person who –

1.  Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;

2.  Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

3.  Conspires to defraud the state by getting a false or fraudulent claim allowed or paid . . .

367. Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the State of Oklahoma false or fraudulent claims for payment or approval in violation of Okla. Stat. tit. 63 § 5053.1(B)(1).

368. Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Oklahoma in violation of Okla. Stat. tit. 63 § 5053.1(B)(2).

369. Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves, their employees and people who worked in the emergency departments who were not employees to defraud the State of Oklahoma by getting false or fraudulent claims allowed or paid by the State of Oklahoma in violation of Okla. Stat. tit. 63 § 5053.1(B)(3).

370. Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

371. The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

372. By reason of Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT XI
### (Violation of the Tennessee Medicaid False Claims Act)

373. Relator realleges and incorporates by reference the allegations made in Paragraph 1 through 279 of this Complaint as though fully set forth herein.

374. This is a claim for treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181, *et seq.*

375. Tenn. Code Ann. § 71-5-182(a)(1) provides liability to any person who –

> (A) Presents, or causes to be presented, to the state a claim for payment under the medicaid program knowing such claim is false or fraudulent;

> (B) Makes, uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the medicaid program paid for or approved by the state knowing such record or statement is false;

> (C) Conspires to defraud the state by getting a claim allowed or paid under the medicaid program knowing such claim is false or fraudulent . . .

376. Through the acts described above, Defendants and their agents and employees presented, or caused to be presented, to officers, employees, or agents of the State

of Tennessee claims for payment under the Tennessee Medicaid program knowing such claims were false or fraudulent, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

377.     Through the acts described above, Defendants and their agents and employees made, used, or caused to be made or used, false records or statements to get false or fraudulent claims under the Tennessee Medicaid program paid for or approved by the State of Tennessee knowing such records or statements to be false, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

378.     Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves, their employees and people who worked in the emergency departments who were not employees to defraud the State of Tennessee by getting claims allowed or paid under the Tennessee Medicaid program knowing such claims were false or fraudulent, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(C).

379.     Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

380.     The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

381.     By reason of Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT XII
### (Violation of the Texas Medicaid Fraud Protection Act)

382.   Relator realleges and incorporates by reference the allegations made in

Paragraph 1 through 279 of this Complaint as though fully set forth herein.

383.   This is a claim for double damages and civil penalties under the Texas

Medicaid Fraud Protection Act, Tex. Hum. Res. Code Ann. §§ 36.001, *et seq.*

384.   Tex. Hum. Res. Code Ann. § 36.002 provides liability to any person

who –

    (1)    knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

    (2)    knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

    . . .

    (4)    knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

        . . .

        (B)    information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

        . . .

    (7)    knowingly makes a claim under the Medicaid program for:

        . . .

        (B)    a service or product that is substantially inadequate or inappropriate when compared to generally recognized

standards within the particular discipline or within the health care industry; or

. . .

(9)    knowingly enters into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent;

385.    Through the acts described above, Defendants and their agents and employees knowingly made or caused to be made a false statement or misrepresentation of a material fact to permit Defendants to receive payments under the Texas Medicaid program that were not authorized or that were greater than the payments that were authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(1).

386.    Through the acts described above, Defendants and their agents and employees knowingly concealed or failed to disclose information that permitted Defendants to receive payments under the Texas Medicaid program that were not authorized or that were greater than the payments that were authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

387.    Through the acts described above, Defendants and their agents and employees knowingly made, caused to be made, induced, or sought to induce the making of false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Texas Medicaid program, in violation of Tex. Hum. Res. Code Ann. § 36.002(4)(B).

388.    Through the acts described above, Defendants and their agents and employees knowingly made claims under the Texas Medicaid program for services that were substantially inadequate or inappropriate when compared to generally recognized standards

within the particular discipline or within the health care industry, in violation of Tex. Hum. Res. Code Ann. § 36.002(7)(B).

389.    Through the acts described above and otherwise, Defendants entered into one or more agreements, combinations or conspiracies among themselves, their employees and people who worked in the emergency departments who were not employees to defraud the State of Texas by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Texas Medicaid program or a fiscal agent, in violation of Tex. Hum. Res. Code Ann. § 36.002(9).

390.    Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

391.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

392.    By reason of Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT XIII
### Violation of the Virginia Fraud Against Taxpayers Act

393.    Relator realleges and incorporates by reference the allegations made in Paragraph 1 through 279 of this Complaint as though fully set forth herein.

394.    This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code, § 8.01-216.1., *et seq.*

395.    Section 3 of the Virginia Fraud Against Taxpayers Act provides liability for any person who –

    (1)    Knowingly presents, or causes to be presented, to an officer or employee of the Commonwealth a false or fraudulent claim for payment or approval;

    (2)    Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth;

    (3)    Conspires to defraud the Commonwealth by getting a false or fraudulent claim allowed or paid.

396.    Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the State of Virginia false or fraudulent claims for payment or approval in violation of Va. Code § 8.01-216.3.

397.    Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Virginia in violation of Va. Code § 8.01-216.3.

398.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves, their employees and people who worked in the emergency departments who were not employees to defraud the State of Virginia by getting false or fraudulent claims paid or approved by the State of Virginia in violation of Va. Code § 8.01-216.3.

399. Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

400. The Virginia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

401. By reason of Defendants' acts, the State of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

WHEREFORE, Plaintiff-Relator Scott H. Plantz, M.D., on behalf of the United States of America and the States of California, Florida, Georgia, Illinois, Indiana, Nevada, New Jersey, New Mexico, Oklahoma, Tennessee, Texas, and Virginia demands that judgment be entered against Defendants, jointly and severally, ordering that:

As to the Federal Claims:

(a)     Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States Government has sustained as a result of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §§ 3729(a);

(b)     Relator be awarded his relator's share of the judgment to the maximum amount provided pursuant to 31 U.S.C. § 3730(d) of the False Claims Act;

(c)    Relator be awarded all costs and expenses of this action, including attorney's fees pursuant to 31 U.S.C. § 3730(d); and

(d)    Relator and the United States of America be awarded such other and further relief as the Court may deem to be just and proper.

As to the State Claims:

(e)    Relator and each named State Plaintiff be awarded statutory damages in an amount equal to three times the amount of actual damages sustained by each State as a result of Defendant's actions, as well as the maximum statutory civil penalty for each violation by Defendants within each State, all as provided by: Cal. Gov't Code § 12651; Fla. Stat. § 68.082; Ga. Code Ann. § 49-4-168.1(a); 740 Ill. Comp. Stat. 175/3; Indiana Code, IC 5-11-5.5-2, Nev. Rev. Stat. § 357.040; N.M. Stat. § 27-14-4; N.J. Stat. Ann. § 2A:32C-3; Okla. Stat. Ann. tit. 63 § 5053.1(B); Tenn. Code Ann. § 71-5-182 and Va. Code § 8.01-216.3;

(f)    Relator and Plaintiff State of Texas be awarded statutory damages in an amount equal to two times the amount of actual damages that Texas has sustained as a result of Defendant's actions, as well as the maximum statutory

civil penalty for each violation of Tex. Hum. Res. Code Ann. § 36.002;

(g)      Relator be awarded his relator's share of any judgment to the maximum amount provided pursuant to: Cal. Gov't Code § 12652(g); Fla. Stat. § 68.085; Ga. Code Ann. § 49-4-168.2(i); 740 Ill. Comp. Stat. 175/4(d); Indiana Code IC 5-11-5.5-6; Nev. Rev. Stat. § 357.210; N.J. Stat. Ann. § 2A:32C-7; N.M. Stat. § 27-14-9; Okla. Stat. Ann. tit. 63 § 5053.4; Tenn. Code Ann. § 71-5-183(d); Va. Code § 8.01-216.7; and Tex. Hum. Res. Code Ann. § 36.110;

(h)      Relator be awarded all costs and expenses associated with each of the pendent State claims, plus attorney's fees, as provided pursuant to: Cal. Gov't Code § 12652(g)(8); Fla. Stat. § 68.086; Ga. Code Ann. § 49-4-168.2(i); 740 Ill. Comp. Stat. 175/4(d); Indiana Code IC 5-11-5.5-6; Nev Rev. Stat. § 357.180; N.J. Stat. Ann. § 2A:32C-8; N.M. Stat. § 27-14-9; Okla. Stat. Ann. tit. 63 § 5053.4; Tenn. Code Ann. § 71-5-183(d); Va. Code § 8.01-216.7; Tex. Hum. Res. Code Ann. § 36.110; and

     (i)     Relator and the State Plaintiffs be awarded such other and further relief as the Court may deem to be just and proper.

Dated:  February 11, 2010

                 Respectfully Submitted by:

                 Frederick H. Cohen
                 David J. Chizewer
                 Matthew K. Organ
                 GOLDBERG KOHN LTD.
                 55 East Monroe Street, Suite 3300
                 Chicago, Illinois  60603
                 Telephone:  (312) 201-4000

# EXHIBIT A



**COMMUNITY HEALTH SYSTEMS**
Division 2 - Monthly Report
Apr-09

| | CHS Benchmarks | Abilene, TX | Alpine, TX | | Big Spring, TX | Brownwood, TX | Cedar Park, TX | Cleveland, TX | College Station, TX | Corsicana, TX |
|---|---|---|---|---|---|---|---|---|---|---|
| **Total Patient Visits** | | | | | | | | | | |
| 1. New Patients | | 1602 | 415 | | 1205 | 1617 | 1832 | 1333 | 2208 | 1950 |
| 2. Non-ED Patients | | 1602 | 414 | | 1205 | 1617 | 1831 | 1330 | 2208 | 1943 |
| 3. Scheduled Returns (Rechecks) | | 0 | 1 | | 0 | 0 | 1 | 3 | 0 | 0 |
| | | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 7 |
| **Admissions:** | | | | | | | | | | |
| 4. # of Admits | | 192 | 72 | | 173 | 224 | 220 | 231 | 317 | 244 |
| 5. % of Admits | 16% | 12.0% | 17.4% | | 14.4% | 13.9% | 12.0% | 17.4% | 14.4% | 12.6% |
| **Observations:** | | | | | | | | | | |
| 6. # of Observations | | 0 | 1 | | 9 | 0 | 7 | 11 | 1 | 9 |
| 7. % of Observations | | 0.0% | 0.2% | | 0.7% | 0.0% | 0.4% | 0.8% | 0.0% | 0.5% |
| **Patient Disposition:** | | | | | | | | | | |
| 8. Transfers | | 7 | 29 | | 32 | 36 | 23 | 47 | 28 | 34 |
| 9. AMA | | 7 | 8 | | 10 | 14 | 10 | 45 | 10 | 22 |
| 10. LWOT | | 42 | 39 | | 34 | 25 | 17 | 32 | 20 | 77 |
| 11. % of AMA and LWOT | <2% | 3.1% | 2.4% | | 3.7% | 2.4% | 1.5% | 5.8% | 1.4% | 5.1% |
| 12. Removed from Presentation (not triaged) | | 38 | 11 | | 23 | 15 | 25 | 56 | 16 | 49 |
| 13. Not Entered | | 38 | 2 | | 0 | 1 | 13 | 14 | 2 | 24 |
| **Patients w/Quality Review Identified:** | | | | | | | | | | |
| Total Quality Review -- | | | | | | | | | | |
| 14. Number of Patients | | 194 | 75 | | 131 | 239 | 127 | 202 | 248 | 267 |
| 15. Percentage | | 12.1% | 18.1% | | 10.9% | 14.8% | 6.9% | 15.2% | 11.2% | 13.7% |
| Admits -- | | | | | | | | | | |
| 16. Number of Patients | | 54 | 34 | | 76 | 110 | 49 | 90 | 103 | 121 |
| 17. Percentage | | 27.8% | 45.3% | | 58.0% | 46.0% | 38.6% | 44.6% | 41.5% | 45.3% |
| Discharged -- | | | | | | | | | | |
| 18. Total Number | | 127 | 21 | | 31 | 113 | 67 | 74 | 132 | 122 |
| 19. Total Percentage | <35% | 65.5% | 28.0% | | 23.7% | 47.3% | 52.8% | 36.6% | 53.2% | 45.7% |
| 20. # Attendings Called | | 16 | 2 | | 23 | 15 | 1 | 9 | 10 | 18 |
| 21. % Attendings Called | | 12.6% | 9.5% | | 74.2% | 13.3% | 1.5% | 12.2% | 7.6% | 14.8% |
| Other Disposition -- | | | | | | | | | | |
| 22. Number | | 13 | 20 | | 24 | 16 | 11 | 38 | 13 | 24 |
| 23. Percentage | | 6.7% | 26.7% | | 18.3% | 6.7% | 8.7% | 18.8% | 5.2% | 9.0% |
| **Test Data:** | | | | | | | | | | |
| Patients with Tests Ordered -- | | | | | | | | | | |
| 24. Number | | N/A | 320 | | 764 | 1109 | N/A | 819 | N/A | 1288 |
| 25. Percentage | >67% | N/A | 77.3% | | 63.4% | 68.6% | N/A | 61.6% | N/A | 65.3% |
| Patients with Test Results -- | | | | | | | | | | |
| 26. Number | | N/A | 230 | | 520 | 718 | N/A | 566 | N/A | 884 |
| 27. Percentage | | N/A | 55.5% | | 92.4% | 91.5% | N/A | 90.9% | N/A | 90.9% |
| 28. Test Guidelines % | >80% | N/A | 52.9% | | 77.5% | 49.5% | N/A | 53.3% | N/A | 52.2% |
| **Time Study Data:** | | | | | | | | | | |
| Average Waits for -- | | | | | | | | | | |
| 29. Initial Assessment | | 00:14 | 00:07 | | 00:04 | 00:06 | 00:11 | 00:12 | 00:07 | 00:13 |
| 30. Primary Assessment | <0:15 | 00:38 | 00:11 | | 00:19 | 00:23 | 00:22 | 00:27 | 00:15 | 00:44 |
| 31. Physician Exam (from Presentation) | <0:27 | 00:56 | 00:22 | | 00:34 | 00:35 | 00:38 | 00:53 | 00:31 | 01:05 |
| 32. Physician Exam (from time in room) | | 00:20 | N/A | | 00:22 | 00:18 | 00:18 | N/A | 00:16 | 00:24 |
| 33. % Of Valid Waits For 29, 30, & 31 | >90% | 68.3% | 75.9% | | 97.3% | 96.7% | 92.6% | 83.1% | 91.9% | 87.8% |
| 34. Inpatient Room | | 01:18 | 01:17 | | 00:51 | 00:54 | 01:01 | 01:42 | 00:52 | 01:15 |
| 35. % Of Valid Room Times | >95% | 8.3% | 28.8% | | 99.5% | 98.2% | 24.7% | 35.5% | 97.2% | 62.1% |
| 36. Delay to Disposition (for all patients) | | 00:29 | N/A | | 00:28 | 00:29 | 00:27 | N/A | 00:27 | 00:40 |
| Patients with -- | | | | | | | | | | |
| 37. Physician Exam Waits > 2 Hrs | | 205 | 6 | | 66 | 86 | 57 | 148 | 14 | 339 |
| 38. Length of Stay > 6 Hrs | | 108 | 29 | | 38 | 54 | 22 | 159 | 93 | 169 |
| 39. Average Physician Length of Stay | | 01:48 | N/A | | 01:27 | 01:26 | 01:30 | N/A | 01:52 | 01:56 |
| 40. % With Valid Times Documented | | 89.8% | N/A | | 67.1% | 91.5% | 98.1% | N/A | 90.8% | 76.6% |
| 41. Average Length of Stay | <2:00 | 02:54 | 03:03 | | 02:21 | 02:19 | 02:18 | 03:20 | 02:37 | 03:23 |
| 42. % With Valid Length of Stay | >95% | 89.3% | 96.6% | | 99.5% | 98.8% | 95.5% | 88.5% | 98.0% | 92.5% |
| **Other Statistical Data:** | | | | | | | | | | |
| Total Attendings Called -- | | | | | | | | | | |
| 43. Number | | 294 | 144 | | 631 | 344 | 280 | 411 | 389 | 349 |
| 44. Percentage | >30% | 18.4% | 34.8% | | 52.4% | 21.3% | 15.3% | 30.9% | 17.6% | 18.0% |
| 45. Discharge Vitals Taken | >90% | 83.5% | 95.2% | | 99.4% | 96.7% | 95.2% | 93.0% | 97.7% | 89.1% |
| 46. Other Data | | N/A | N/A | | N/A | N/A | N/A | N/A | N/A | N/A |
| 47. Nursing Acuity Weighted Mean | 3.43 | 2.95 | 3.93 | | 3.54 | 3.18 | 3.09 | 3.23 | 3.24 | 3.35 |
| Unscheduled Returns -- | | | | | | | | | | |
| 48. Possible Unscheduled Returns | | 43 | 12 | | 49 | 54 | 23 | 30 | 61 | 67 |
| 49. % of Unsch Returns to New Patients | | 2.7% | 2.9% | | 4.1% | 3.3% | 1.3% | 2.3% | 2.8% | 3.4% |
| 50. Patients Admitted/Expired/DOA | | 6 | 3 | | 11 | 10 | 2 | 5 | 9 | 12 |
| 51. % Admitted/Expired/DOA | | 14.0% | 25.0% | | 22.4% | 18.5% | 8.7% | 16.7% | 14.8% | 17.9% |

*Detailed Physician Time Studies are unavailable without Electronic Physician Documentation

c Physician Documentation

Prepared by: Pro-MED Clinical Systems, L L C.

## CHS

---MEMORANDUM---

**TO:**        Chief Officers – Group II Facilities

**FROM:**      Michael Portacci
               President – Division II Operations

**DATE:**      May 27, 2009

**SUBJECT:**   **ProMed Executive Summary Report – April 2009**

Attached, for your further analysis, is the April '09 ProMed Executive Summary Report.

In my review of the statistics, I noted the following regarding overall performance for Group II facilities compared to prior month and benchmarks:

| | Benchmark |
|---|---|
| Admission Percentage for All Patients | 16.0% |
| Total Percentage Discharged | <35.0% |
| Patients 65-Older | |
|     Admission Percentage | 46.1% |
|     Attendings Called | 62.3% |
| Time Study Data | |
|     Primary Assessment Time | <:015 |
|     Physician Exam Time | <:027 |
| ALOS | <2:00 |

In comparing our April percentage rate of 14.5% to the company benchmark of 16.0%, we potentially lost 641 admissions for the month. Just hitting a 45% admission benchmark for patients 65-older would have yielded 251 admissions. As a further matter of comparison, Divisions II and IV have the lowest admission percentage of all Divisions for April '09 YTD.

As continually stated, it is imperative that we follow the ED quality initiatives and utilize ProMed as a tool or resource to retain more appropriate admissions. There continues to be opportunity with your daily/weekly management of the ED patients and patients in the 65-older category continue to run well below the benchmark.

MTP/gf
Attachment

cc:        Division VPs